## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 23 2020, 9:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel G. Foote
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of N.B. (Minor Child); <br><br> G.B. (Father), <br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Petitioner,* <br><br> and <br><br> Child Advocates, Inc., | July 23, 2020 <br><br> Court of Appeals Case No. 19A-JT-2945 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Scott B. Stowers, Magistrate <br><br> Trial Court Cause No. 49D09-1904-JT-439 |



*Appellee-Guardian Ad Litem.*

**Najam, Judge.**

# Statement of the Case

G.B. ("Father") appeals the trial court's termination of his parental rights over his minor child N.B. ("Child"). Father presents a single dispositive issue for our review, namely, whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the termination of his parental rights. We affirm.

# Facts and Procedural History

Father and M.R. ("Mother")[1] (collectively, "Parents") are Child's parents. When Child was born on May 20, 2017, a test on the umbilical cord blood was positive for cocaine. Accordingly, DCS filed a petition alleging that Child was a child in need of services ("CHINS") and removed Child from Parents' care.

---

[1] Mother's parental rights over Child have also been terminated, but Mother does not participate in this appeal.

At an ensuing factfinding hearing, Mother admitted that Child was a CHINS, and Father waived his right to a factfinding hearing.

[3] After the juvenile court found that Child was a CHINS, the court entered a dispositional order. The court ordered Father to participate in a home-based case management program and follow all recommendations and to submit to random drug and alcohol screens. Beginning at the end of 2017 through spring of 2018, Father told his case manager that "he did not want to engage in services." Tr. Vol. 2 at 79. Accordingly, in September 2018, the juvenile court entered a modified dispositional order, which required Father to engage in home-based therapy and to complete a substance abuse assessment and follow all treatment recommendations. Again, Father failed to comply.

[4] In April 2019, DCS filed petitions to terminate Father's and Mother's parental rights over Child. Following a hearing, the trial court granted the termination petitions on November 19, 2019. In support of its order, the trial court entered the following relevant findings:

> 10. The [C]hild remained in the hospital for approximately two (2) months following her birth. During that time, she was very small and in an incubator.
>
> 11. Following her discharge from the hospital, [Child] was placed in relative care with her paternal grandmother.
>
> 12. The child has been placed in foster care with [C.B.] and [R.R.] since January 5, 2018.

13.  When the child first was placed in foster care, she was very small and had asthma and respiratory issues, as well as [a] runny nose and rashes.

14.  The foster parents have taken the child to regular medical appointments.

15.  When [Child] was first placed with her foster parents, she was on a breathing machine three times per day to assist with her asthma.  She . . . no longer requires a breathing machine.

16.  The child is happy and doing well in foster care.  She refers to her foster parents as "mom and dad."  This is a pre-adoptive placement.

* * *

18.  [Father] has been consistent with parenting time and he sees the child twice per week.

* * *

25.  Teresa Marshall of Haven Focused was referred to provide home based case management for [Father] in August 2019.

26.  [Father] was not employed when he began working with Ms. Marshall.  He has since obtained employment.

27.  [Father] has obtained stable housing with working utilities, although it is too small to accommodate the child.

28.  [Father] is currently exercising parenting time with the child, and such sessions are going well.

29.  [Father] has attended . . . nearly all hearings in [Child's] CHINS case over the past two years. . . .

30. [Father] has missed numerous drug screens.

31. The [family case manager ("FCM")] has made appropriate referrals to assist the parents in complying with court ordered services.

32. Home based case management was closed out in spring 2018 when [Father] stated that he didn't want to engage.

33. After [Father] expressed a desire to re-engage, the FCM re-referred home based case management to [Father] in May 2018.

\* \* \*

36. Weldon Koech of Haven Focused was referred to provide home based therapy for [Father] in September 2018.

37. [Father] disclosed to Mr. Koech that he struggled with marijuana usage and that he began using daily following his involvement in a car accident.

38. [Father] agreed to stop smoking marijuana and promised Mr. Koech that he would submit clean screens. However, he did not follow through.

39. Mr. Koech recommended that [Father] complete a "dual diagnosis" program at Gallahue in January 2019, to address his marijuana usage.

40. In March 2019, [Father] went to an intake session at Gallahue and Mr. Koech discharged [Father] from home based therapy because he needed a higher level of care, specifically, dual diagnosis.

\* \* \*

42. [Father] agreed to complete a substance abuse assessment. However, he failed to follow through.

43. The FCM repeatedly discussed with [Father] the importance of completing services and submitting clean drug screens.

44. Despite these reminders and admonishments, [Father] continued to miss drug screens and submit[ted] positive screens, including a positive screen on the day of the September 25, 2019[,] trial setting.

45. [Father]'s treatment team has recommended that [Father] progress to unsupervised parenting time with the child upon the submission of three (3) consecutive clean screens. [Father] has been unable to do so.

* * *

48. Jacqueline Lentz of Community Health Network was referred to provide therapy for [Father] and conducted an intake assessment on April 22, 2019.

49. [Father] admitted to Ms. Lentz daily marijuana usage since he was fifteen years old.

50. [Father] attributed his marijuana use to chronic pain from a car accident.

51. [Father] was diagnosed with Major Depressive Disorder and Cannabis Disorder.

52. [Father] had been prescribed Zoloft for his depression, but was not taking the medication at the time of his intake with Ms. Lentz.

53. Ms. Lentz recommended Dual Diagnosis Group to treat mental health and substance abuse usage.

54. [Father] was to appear at the group sessions three times per week and to see Ms. Lentz monthly.

55. [Father] never appeared at the Dual Diagnosis Group, and on May 6, 2019, he was unsuccessfully discharged for non-participation.

56. Jordan Snoddy of Families First provided intensive outpatient ("IOP") group treatment to [Father] beginning in November 2018.

57. Ms. Snoddy's IOP program consisted of 24 group sessions as well as weekly drug screens.

58. [Father] attended Ms. Snoddy's program regularly. However, he had nine (9) absences, seven (7) of which were unexcused.

59. Ms. Snoddy's IOP program had a policy in which three (3) absences, either excused or unexcused, would result in discharge from the program.

60. Ms. Snoddy also recommended that [Father] participate in a dual diagnosis program.

61. [Father] engaged with Ms. Snoddy initially. However, as time went on, his engagement decreased and he became bored with the program.

62. [Father] was discharged from Ms. Snoddy's IOP program in March 2019 without completing the IOP program or the aftercare program.

* * *

76. Debbrena Curtis of Haven Focused has . . . provided home based case management and supervised parenting time to [Father] for approximately 18 months, until the summer of 2019.

77. Although [Father] was appropriate with the child during his time working with Ms. Curtis, he never progressed to unsupervised parenting time.

78. The child had been removed from her parents' care and custody for at least six (6) months pursuant to a dispositional decree prior to this Termination Action being filed on April 6, 2019.

* * *

81. There is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied by her parents. [Mother] and [Father] have had over two years to put forth an effort and have not done so. . . . [Father] continues to use marijuana, and he did not successfully complete substance abuse treatment. He also failed to attend dual diagnosis assessment. He was advised that he would progress to unsupervised parenting time upon the submission of three consecutive drug screens and was unable to comply.

82. Continuation of the parent-child relationship poses a threat to the child's well-being in that it would serve as a barrier for her obtaining permanency through an adoption when her parents are unable and unwilling to provide permanency and parent. The child is thriving in her current placement.

83. Termination of the parent-child relationship[s] is in the child's best interests. Termination would allow her to be adopted into a stable and permanent home where her needs will be safely met.

84. There exists a satisfactory plan for the future care and treatment of the child, that being adoption.

Appellant's App. Vol. 2 at 17-20. Thus, the juvenile court terminated Father's parental rights over Child. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

[5] Father contends that the trial court erred when it terminated his parental rights. We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[6] As relevant here, before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[; or]
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> \* \* \*
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2020). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[7] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.

*Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[8]     Here, in terminating Father's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9]     On appeal, Father contends that the juvenile court's finding that his home is too small to accommodate Child is unsupported by the evidence, and he asserts that "Father's use of THC" does not support termination of his parental rights. Appellant's Br. at 20. Father also contends that the trial court erred when it concluded that: (1) the conditions that resulted in Child's removal and the reasons for her placement outside of his home will not be remedied; (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child; and (3) termination is in Child's best interests. However, as Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address the issue of whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat

to the well-being of Child. We otherwise address each of Father's contentions in turn.

### Size of Father's Home

Father first contends that the juvenile court erred when it found that his home is "'too small to accommodate'" Child. Appellant's Br. at 19 (quoting Appellant's App. Vol. 2 at 92). In support, Father directs us to the testimony of three witnesses stating that his one-bedroom apartment was appropriate for him and Child. However, as the State points out, Theresa Marshall, Father's case manager, testified that Father "wanted to look for an apartment with more bedroom[s]." Tr. Vol. 2 at 58. Thus, the State maintains that the juvenile court was entitled to conclude that Father's one-bedroom apartment was too small for Father and Child. In any event, even assuming the court erred when it so found, any error was harmless. As this Court has held, where an erroneous finding is not the "sole support for any conclusion of law necessary to sustain the judgment," it is "harmless surplusage" and not reversible error. *Karma W. v. Marion Cty. Dep't of Child Servs. (In re B.J.)*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008), *trans. denied*. Here, there is no question, and Father does not allege, that the court's finding that his apartment was too small is not the sole support for any conclusion of law. Thus, any error was harmless.

### Father's Use of Marijuana

Father next contends that, because DCS did not present evidence "to show *how* Father's use of THC has adversely affected [Child] or his ability to parent,"

Father's use of marijuana does not support termination of his parental rights. Appellant's Br. at 28 (emphasis original). Father maintains that, to the contrary, the undisputed evidence shows that Father's marijuana use had no impact on Child. However, Father does not challenge any of the court's findings with respect to his marijuana use. As the State points out, Father's contention on this issue is merely a request that we reweigh the evidence, which we cannot do.

[12] Father attempts to analogize his use of marijuana to that of parents in cases where our courts have held that proof of the occasional use of marijuana without any showing that a child is endangered thereby is not grounds for a CHINS determination. *See* Appellant's Br. at 27. But Father ignores the "dual diagnosis" he received, which means that he has "mental health and substance[-]related issues" that are connected. Tr. Vol. 2 at 122. And "[i]ndividuals diagnosed with [a dual diagnosis] face greater consequences from substance abuse compared to those patients diagnosed with only a mental illness[.]" Kathryn Hryb et al., Letter to the Editor, *A Call for Standardized Definition of Dual Diagnosis*, Psychiatry, Sept. 2007, at 15-16, https://www.ncbi.nlm.nih.gov/pmc /articles/PMC2880934/pdf/PE_4_9_15.pdf. In other words, where, as here, there is evidence of comorbidity, Father's marijuana use is not insignificant and not analogous to that of the parents in the cases he cites. Father has not demonstrated any error on this issue.

### *Reasons for Child's Placement Outside of Father's Home*

[13]    Father contends that DCS did not present sufficient evidence to prove that the reasons for Child's placement outside of his home will not be remedied. This court has clarified that, given the wording of the statute, it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also any basis resulting in the continued placement outside of a parent's home. *Inkenhaus v. Vanderburgh Cty. Off. of Fam. & Child. (In re A.I.)*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Here, the trial court properly considered the conditions leading to the continued placement outside of Father's home, including Father's failure to address either his substance abuse or mental health issues. The court observed that Father did not participate in the mental health services that were recommended following his psychological evaluation.

[14]    We hold that the evidence supports the trial court's findings and conclusion. To determine whether there is a reasonable probability that the reasons for Child's continued placement outside of Father's home will not be remedied, the trial court should judge Father's fitness to care for Child at the time of the termination hearing, taking into consideration evidence of changed conditions. *See E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts

have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

The trial court found, and the evidence supports, that: Father has a history of substance abuse and mental illness; Father does not take medication prescribed for his depression; Father "never appeared at the Dual Diagnosis Group" that was recommended to treat his substance abuse and mental illness and was "discharged for non-participation"; and Father needed to show only three consecutive clean drug screens in order to transition to unsupervised parenting time with Child, but he was unable to do that. Appellant's App. Vol. 2 at 94. Father's argument on appeal is simply an invitation for this Court to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. Based on the totality of the circumstances, we hold that the trial court's findings support its conclusion that the conditions that resulted in Child's removal and the reasons for her placement outside of his home will not be remedied.

### Best Interests

Father also contends that the trial court erred when it concluded that termination of his parental rights is in Child's best interests. In determining what is in a child's best interests, a juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *A.S. v. Ind. Dep't of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). A

parent's historical inability to provide "adequate housing, stability, and supervision," in addition to the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *Id*.

[17] When making its decision, the court must subordinate the interests of the parents to those of the child. *See Stewart v. Ind. Dep't of Child Servs. (In re J.S.)*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship." *Id*. Moreover, this Court has previously held that recommendations of the family case manager and court-appointed advocate to terminate parental rights, coupled with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id*.

[18] Father asserts that, as one witness testified, "[g]iven more time, . . . Father not only *could* complete any remaining services, but that he *should* be given more time to do so." Appellant's Br. at 33 (emphases original). But Father ignores the fact that he had two years from the time DCS filed the CHINS petition until the final hearing to comply with services. He gives no explanation why two years was not enough time to be assessed and participate in appropriate treatment for his substance abuse and mental illness.

[19] As the trial court's findings demonstrate, Father has not shown that he is capable of parenting Child. Other than his substantial compliance with supervised visits with Child, Father did not complete the court-ordered services.

Child has lived with her foster parents since January 2018, which is a pre-adoptive home, and she is bonded and thriving. Both the FCM and the CASA recommended termination of Father's parental rights. Given the totality of the evidence, Father cannot show that the trial court erred when it concluded that termination of his rights was in Child's best interests.

[20] Affirmed.

Bradford, C.J., and Mathias, J., concur.